OPINION OF THE COURT
Harold J. Hughes, J.
All of the parties request summary judgment relief in these actions to declare chapter 210 of the Laws of 1990 unconstitutional for violating section 7 of article V of the New York State Constitution.
The individual plaintiffs are working and retired members of the Retirement Systems, as well as officers of the major unions representing public employees. The Common Retirement Fund (CRF) holds the assets and income of the New York State Local Police and Fire Retirement System and the New York State Local Employees’ Retirement System (Retirement Systems). The Comptroller of the State of New York is the trustee of the CRF (Retirement and Social Security Law § 422). Beginning in 1921, successive Comptrollers have used the aggregate cost method (AC method) as the actuarial funding method to determine the annual contributions to be made by public employers to the CRF. The AC method has been described by all parties as fiscally conservative, an *139 approach that resulted in a surplus in the CRF of between $7 to $9 billion by the late 1980’s.
Until July 1, 1940, State and municipal employees participating in the various retirement systems had their benefits and funding at the mercy of Legislatures, State and local, with the guarantee of benefits only occurring at the time of actual retirement when a contractual relation between the retiree and the former employer came into being (Roddy v Valentine, 268 NY 228). After intense and illuminating debate, the delegates to the 1938 Constitutional Convention voted to strip the State and local Legislatures of much of their power over public employee retirement funds and systems by enacting section 7 of article V of the New York State Constitution which provides: "After July first, nineteen hundred forty, membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired”.
In Birnbaum v New York State Teachers Retirement Sys. (5 NY2d 1, 8-9), the Court of Appeals explained the effect of the constitutional provision as follows:
"It seems clear that the foregoing constitutional provision was designed to overcome the dictum in the Roddy case (supra) to the effect that prior to retirement, pension and retirement systems of the State or of a civil division thereof, created wholly or largely out of public moneys, were subject to the will of the Legislature. By the constitutional amendment the people determined to confer contractual protection upon the benefits of pension and retirement systems of the State and of the civil divisions thereof, and to prohibit their diminution or impairment prior to retirement. As this court said in Matter of Day v Mruk (307 N. Y. 349, 354): '[A]fter such effective date [that of the constitutional amendment] such systems were no longer gratuitous, but by virtue of the new amendment became contracts and the members of pension systems thereby acquired vested interests which could not thereafter be diminished or impaired. Excerpts from the proceedings of the Convention appear to bear out this conclusion.’
"Thus, prior to the constitutional amendment, it was retirement that fixed the rights of the employee. The purpose of the amendment was to fix the rights of the employee at the time he became a member of the system”.
Paragraph (1) of subdivision (b) of former section 23 of the *140 Retirement and Social Security Law provided that the employer contribution “rate shall be a uniform and constant rate per centum of annual compensation”. This language did not designate a specific method for funding the CRF, but left that to the discretion of the Comptroller. From 1921 until the enactment of chapter 210 of the Laws of 1990 all Comptrollers exercised that discretion by choosing the AC method to determine annual contribution to be made by employers. In November of 1986, the Government Accounting Standards Board promulgated regulations requiring pension systems to begin financial reporting based upon the projected unit credit (PUC) method. This financial reporting system was instituted to allow a comparison among systems nationwide as to any underfunding or overfunding. In his 1987 Report of the New York State and Local Retirement Systems, the Comptroller reported a surplus in pension funds in excess of $7 billion using the PUC method. By 1990, the State was in another fiscal crisis facing a multibillion dollar budget deficit. One possible means of reducing the fiscal pressure upon the State and local governments was to reduce the contributions they were required to make to the Retirement Systems. This could be done if the PUC method replaced the AC method because as a result of the switch the current contribution requirements of public employers would be offset by the surplus until that sum was expended. Estimates were that implementing the PUC method would reduce or eliminate public employer contributions to the CRF for approximately 10 years. Thereafter, studies projected that the amount required to be contributed to the CRF by public employers would increase dramatically.
The Comptroller vigorously opposed the change to the PUC method, contending that it threatened the integrity of the Retirement Systems, and was a fiscal gimmick to give the State and local governments the present use of what would otherwise be pension fund money, with any untoward fiscal result being left to be dealt with by future generations. Nonetheless, the Legislature enacted chapter 210 of the Laws of 1990 which mandated changing the actuarial funding method from the AC method to the PUC method, and established a five-year stock valuation smoothing method as opposed to the four-year method the Comptroller had opted for. The Comptroller projected that the new law would deprive the Retirement Systems of approximately $800 million in em *141 ployer contributions for the 1991 fiscal year alone. These lawsuits resulted.
The State Constitution places many fiscal restraints upon the actions of the State and local governments. The ultimate responsibility for the enforcement of those constitutional restraints is with the courts. The procedure works if Judges look to the words and intent of the framers of the Constitution, rather than be swayed by the supposed necessity of the current crisis. In the case of public employees, a contractual relationship was entered into with their employers on July 1, 1940 providing that their pensions would be funded and secure. A method of so doing had been in place since 1921. Chapter 210 of the Laws of 1990 changed that. The issue is whether such change runs afoul of section 7 of article V of the New York State Constitution. In this court’s view, it does.
Sgaglione v Levitt (37 NY2d 507) provides guidance. In that case the Court of Appeals ruled that legislation limiting the investment discretion of the Comptroller was unconstitutional. One of the central issues before the Court of Appeals was whether the term "benefits” set forth in section 7 of article V is limited to pecuniary benefits, or also encompasses the Comptroller’s discretion as trustee. Judge Cooke succinctly summarized the holding of the majority upon that issue in his dissenting opinion, as follows: "There is no basis for the finding of the majority that the discretion of the Comptroller, as 'trustee’, is a benefit within the contemplation of the Constitution. Rather, all prior pertinent case law would lend support to the conclusion that section 7 of article V of the Constitution is not a bar to the legislative measure under scrutiny, since the term 'benefits’, in this context, refers only to pecuniary benefits” (37 NY2d, at 516).
Under Sgaglione (supra), the discretion of the Comptroller as trustee is a benefit protected by section 7 of article V of the Constitution. The primary contention of the defendants is that the method of funding the CRF is a power reserved to the Legislature, which it has not surrendered to the Comptroller, and which is not among his powers as trustee. That may have been true prior to July 1, 1940. Before that date no statute directed the Comptroller as to a specific method of funding the CRF, but all Comptrollers had exercised independent discretion to choose the AC method. Prior to July 1, 1940, the Legislature could have enacted a statute altering that choice. Following the Constitutional Convention of 1938, the people chose to take that power away from the State Legislature *142 through the enactment of section 7 of article V. One of the contract benefits public employees acquired as a result of the constitutional amendment was the right to an independent trustee imbued with the discretion to protect their retirement funds. Chapter 210 of the Laws of 1990 is an unconstitutional attempt to divest public employees of that contract right. It will not stand. The legislation would divert the accumulated pension funds of public employees to meet a present fiscal crisis by reducing the contributions of public employers in order to avoid raising taxes or cutting other programs. This is precisely the type of conduct the constitutional amendment was designed to prevent.
The motion of Howard Shafer, individually and as president of the Public Employees Federation, AFL-CIO, to intervene as a plaintiff in action No. 1 is granted. The motions of the plaintiffs for summary judgment declaring sections 1 through 7 of chapter 210 of the Laws of 1990 of the State of New York to be void and unconstitutional pursuant to article V, § 7 of the New York State Constitution will be granted. The cross motions of the defendants for summary judgment will be denied. Counsel for plaintiff Joseph P. Puma is directed to submit a proposed judgment on notice encompassing all of the determinations made herein.